**V.F. JONES Sr., as Administrator of the Estate of C.J. Jones, Petitioner,**

v.

**C. Jones P., Respondent.**

No. CN98–08821.

Family Court of Delaware, New Castle County.

Submitted: Aug. 20, 2001.
Decided: Aug. 31, 2001.

---

**50.** Puglisis Nationwide Automobile Insurance Policies at U2.

**51.** *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

David J. Haley, Esquire, Law Office of David J. Haley, Wilmington, for Petitioner.

Francine R. Solomon, Esquire, Ferrara, Haley, Bevis & Solomon, Wilmington, for Respondent.

WASERSTEIN, J.

### Background

■ The parties were married on July 23, 1988, separated on January 2, 1998 and were divorced by final decree on October 1, 1998. Husband died intestate on January 6, 1999. In November of 1998, following the divorce decree but before the property division, Husband unilaterally changed the designated beneficiary status of his 401(k) account from his Wife to his two minor children. This action was in violation of 13 *Del. C.* § 1509 which prohibits unilateral transfers of marital property while the divorce proceeding is pending. The Administrator filed a Motion in Limine on April 12, 2001, arguing that the change in designation of the beneficiary is permissible because the Employment Retirement Income Security Act (ERISA) (29 U.S.C.A. § 1001 et seq.) pre-empts any state law which enjoins that action. Wife responded to the Motion on May 10, 2001, arguing that the anti-alienation clause of ERISA was designed to protect the former spouse, not deprive her of funds acquired during the marriage. The Court has reviewed the parties' memoranda and based on ERISA's pre-emption of state law, the children will remain the beneficiaries of Husband's 401(k) account. However, because Husband unilaterally changed the designated beneficiary status of his 401(k) account while the divorce proceeding was pending in violation of 13 *Del. C.* § 1509, the 401(k) account will be treated as a marital asset in the property distribution.

### Employee Retirement Income Security Act (ERISA)

The 1974 enactment of ERISA was intended to address the "inadequacy of cur-

rent minimum standards for employee benefit plans" which were "established or maintained by an employer..."[1] 29 U.S.C.A. § 1001(b) states that the policy underlying ERISA is "to protect...the interest of participants in employee benefit plans and their beneficiaries..." 29 U.S.C.A. § 1001(c), in turn, mandates that ERISA contain certain safeguards and guarantees which ensure the "equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service..." With the exception of a few enumerated categories, a plan fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries..."[2]

■ Hence, in 1974 Congress enacted ERISA for the purpose of assuring that American workers "may look forward with anticipation to a retirement with financial security and dignity, without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society."[3] To ensure that an employee's accrued benefits are actually available for retirement purposes, ERISA's anti-alienation provision is mandatory and requires that plan benefits can not be assigned or alienated.[4]

### Retirement Equity Act (REA)

In 1984, Congress enacted the Retirement Equity Act (REA), which modified ERISA by creating an exception to its anti-alienation provision and expanding the rights of spouses in only narrow circumstances delineated by its procedures pertaining to surviving spouses or the filing of Qualified Domestic Relations Orders (hereinafter referred to as QDROs).[5]

29 U.S.C.A. § 1055(c) affords protection to a surviving spouse to the extent that survivor benefits automatically pass to the surviving spouse upon the participant's (or employee's) death. A participating spouse (employee) is precluded from waiving the non-participating spouse's benefit unless the non-participating spouse consents in writing.[6] In *Kahn v. Kahn*,[7] the United States District Court S.D. New York eval-

---

**1.** Note, *Restricting The Corporate Practice of Medicine: Subverting ERISA to Hold Managed Care Organizations Accountable For Health Care Treatment Decisions—The Texas Initiative*, 23 Del. J. Corp. 1203, 1215–16 (1998), citing 29 U.S.C.A. § 1001 (West 1985) and 29 U.S.C.A. § 1002(1) (West Supp.1997).

**2.** 29 U.S.C.A. § 1104(a)(1).

**3.** *Smith v. Mirman*, 749 F.2d 181, 182 (4th Cir.1984) (quoting from S.Rep. No. 93–127, 93rd Cong., 2d Sess (1974)).

**4.** 29 U.S.C.A. § 1056(d)(1) provides in relevant part that "each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Federal Regulations define "assignment" and "alienation" as "[a]ny arrangement providing for the payment to the employer of plan benefits which otherwise would be due the participant under the plan, and [a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a partici-

pant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary." *See Robbins v. DeBuono*, 218 F.3d 197, 202–03 (2nd Cir.2000), citing, 26 C.F.R. § 1.401(a)13(c)(1)(ii) which, according to the Second Circuit, emphasizes that the anti-alienation provision applies while the benefits are held by the plan administrator and not after they reach the hands of the beneficiary.

**5.** REA amended ERISA by creating an exception to its anti-assignment provision for state domestic relations orders that meet the requirements of a QDRO (29 U.S.C. 1056(d)(3)(A)) or the surviving spouse provision 29 U.S.C.A. 1055(c).

**6.** *See,* 29 U.S.C.A. § 1055(c)(2)(A)(i).

**7.** 801 F.Supp. 1237 (S.D.N.Y.1992).

uated whether a participant's former spouse has a right to her deceased former Husband's benefits under REA following a divorce. That Court held that an *ex parte* divorce, which allows either party to legally remarry, severs the spousal right under REA.[8] The Court further found that nothing in the language of ERISA can reasonably be interpreted to allow a divorced wife the same right as a spouse unless a QDRO has been issued.[9]

### REA and the Qualified Domestic Relations Orders

A state court's domestic relations order pertaining to spousal property rights is a QDRO when it "creates or recognizes the existence of an alternate payee's right to ... receive all or a portion of the benefits payable ..." under the plan.[10] This provision means that a QDRO creates or recognizes that a plan non-participant or ex-spouse has a right to a portion of the participant's benefits under the plan and is exempt from the restrictive anti-alienation provision.[11] A QDRO is any "judgment, decree, or order (including approval of a property settlement agreement"), that pertains to "child support, alimony payments or marital property rights to a spouse, former spouse, child, or other dependent of

a participant" and is made "pursuant to a state domestic relations law..."[12] Congress required that QDROs meet certain specific requirements in order to spare "plan administrators the grief they experience because of uncertainty concerning the identity of the beneficiary..."[13] These QDRO provisions are at the core of REA, which was enacted to provide enhanced protection to spouses and dependent children in the event of a divorce or separation, or in the event of the death of a surviving spouse. "Apart from these detailed provisions, ERISA does not confer beneficiary status on nonparticipants by reason of their marital or dependent status".[14]

### Egelhoff v. Egelhoff

In *Egelhoff*,[15] the Supreme Court held that a Washington statute providing for automatic revocation, upon divorce, of any designation of a spouse as beneficiary of a nonprobate asset was pre-empted, as it applied to an ERISA benefit plan. While David Egelhoff was married to Wife (Donna Rae Egelhoff), he designated her as the beneficiary of his life insurance policy and pension plan provided by his employer. The parties divorced in April of 1994, and

---

8. *See, Kahn v. Kahn,* 801 F.Supp. 1237, 1241 (S.D.N.Y.1992) which explains that ERISA does not define the term "spouse" and *cites, Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) for the proposition that, when Congress uses a term not otherwise defined by the statute, the common law meaning applies. After consulting Black's Law Dictionary (5th Edition) and Webster's Third New International Dictionary, the Southern District of New York concludes that "spouse" means a man and woman joined in wedlock; in short, a Husband and Wife.

9. *Kahn,* 801 F.Supp. at 1243. *See also, Boggs v. Boggs,* 520 U.S. 833, 845, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997).

10. 29 *U.S.C.A.* 1056(d)(3)(b)(i)(I).

11. *See, Stewart v. Thorpe Holding Company Profit,* 207 F.3d 1143, 1148 (9th Cir.2000) (the QDRO exception was enacted to protect the financial security interest of an ex-spouse). *See also,* 29 *U.S.C.A.* 1056(d)(3)(K)(an alternate payee ex-spouse is to be considered a plan beneficiary).

12. *See,* 29 *U.S.C.A.* 1056(d)(3)(B)(ii).

13. *Stewart,* 207 F.3d at 1149–1150.

14. *Boggs,* 520 U.S. at 845, 117 S.Ct. 1754.

15. *Egelhoff v. Egelhoff,* 532 U.S. 141, 149–50, 121 S.Ct. 1322.

Mr. Egelhoff died intestate two months later. Mr. Egelhoff's children from his prior marriage filed a lawsuit to recover Mr. Egelhoff's life insurance and pension plan benefits.[16] Their argument relied on a Washington statute that provided, in relevant part, that the designation of a spouse as the beneficiary of a nonprobate asset, defined to include a life insurance policy or employee benefit plan, is revoked automatically upon divorce.[17] Based on the statutory language, the children argued that the proceeds should pass automatically to them as their Father's statutory heirs because Wife's beneficiary status was revoked upon the parties' divorce.[18] The Supreme Court concluded that the state statute is expressly pre-empted by ERISA, and Wife remained the beneficiary of the life insurance and pension plan benefits.[19] The Court emphasized that it would be contrary to the underlying principles of ERISA to compel plan administrators the undue burden of familiarizing themselves with state statutes to determine whether the named beneficiary status has been revoked, or modified and, in this context, choice of law problems may impede efficient administration of ERISA plans.[20] Hence, the fiduciary shall administer the plans "in accordance with the documents and instruments governing the plan",[21] making payments to the "beneficiary" who is designated by a participant, or by the terms of the plan.[22]

### ERISA's Pre-emption of State Domestic Relations Law

■ ERISA's pre-emption section, 29 *U.S.C.A.* § 1144(a), states that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan..."[23] The Washington statute in *Egelhoff* impeded one of the principal goals of ERISA, which is to enable employers "to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits."[24] ERISA was designed to simplify plan administration and requiring administrators to master the relevant laws of all fifty States would undermine the goal of ERISA, which is to minimize the administrative and financial burdens on plan administration.[25] In sum, absent a QDRO, plans are to pay the named beneficiary in accordance with the plan docu-

---

**16.** *Egelhoff*, 532 U.S. at 146–48, 121 S.Ct. 1322.

**17.** *Id.* Wash. Rev.Code. § 11.07.010(2)(a) (1994) reads as follows: If a marriage is dissolved or invalidated, a provision made prior to that event that relates to the payment or transfer at death of the decedent's interest in a nonprobate asset in favor of or granting an interest or power to the decedent's former spouse is revoked. A provision affected by this section must be interpreted, and the nonprobate asset affected passes, as if the former spouse failed to survive the decedent, having died at the time of entry of the decree of dissolution or declaration of invalidity.

**18.** *Id.*, 532 U.S. at 149–50, 121 S.Ct. 1322.

**19.** *Id.*

**20.** *Id.* 532 U.S. at 150–52, 121 S.Ct. 1322.

**21.** *Id.* 29 *U.S.C.A.* 1104(a)(1)(D).

**22.** *Id.* 29 *U.S.C.A.* 1002(8).

**23.** *See also, Blue Cross & Blue Shield v. Travelers Inc. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), and *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). These cases describe ERISA's pre-emption in broad terms.

**24.** *Egelhoff,* 532 U.S. at 150–52, 121 S.Ct. 1322, *citing, Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

**25.** *Id.,* 532 U.S. at 152–54, 121 S.Ct. 1322.

ments. Because Congress expressly addressed it, state family law is pre-empted when it conflicts with this federal law.[26]

*13 Del. C. § 1509 Preliminary Injunction*

■ In November of 1998, following the divorce decree but during the pendency of the property division divorce proceedings, Husband unilaterally changed the designated beneficiary of his 401(k) account from Wife to his two minor children, as the sole beneficiaries of that account. The change in designation of beneficiary was done in violation of 13 *Del.C.* § 1509, which reads in relevant part:

> (a) Upon the filing of a petition for divorce or annulment, a preliminary injunction shall be issued against both parties to the action, enjoining them from:
>
> (1) Transferring, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life, and requiring the parties to notify the other of any proposed extraordinary expenditures and to account to the Court for all extraordinary expenditures after the preliminary injunction becomes effective; . . . .

The preliminary injunction shall be effective against the petitioner upon the filing of the petition for divorce and upon the respondent upon service of a copy of the petition.

Under Delaware law, parties to a divorce proceeding are automatically enjoined from transferring, encumbering, concealing or in any way disposing of any property with the limited exception of nor-

mal business activities or for the necessities of life. Moreover, parties are required to notify the opposing party of any proposed extraordinary expenditures and to account to the Court for all extraordinary expenditures after the injunction becomes effective.[27] Husband, an attorney licensed to practice law in the state of Delaware, was served with a copy of the divorce petition and the injunction order on July 17, 1998. In November of 1998, Husband changed the beneficiary status of his 401(k) plan from Wife to his two minor children. This action constitutes a "transfer" of marital property under § 1509, and his failure to inform Wife and the Court of the transfer violated said provision.[28]

### Analysis

Wife argues, without citing any authority, that the anti-alienation clause of ERISA was designed to protect a former spouse's claim to funds acquired during the marriage. This interpretation of the anti-alienation provision is inaccurate. The anti-alienation provision was designed to ensure that employees' accrued benefits are actually available for retirement.[29] ERISA confers beneficiary status in narrow circumstances on a nonparticipant or dependent spouse. For example, 29 *U.S.C.A.* § 1055(c)(i) protects a surviving spouse's beneficiary status to the extent that the parties are married at the time of the participant's death.

■ In this case, Husband and Wife were divorced by a final decree of this Court on October 1, 1998, terminating their marital relationship. Wife's option at the time was to request an interim QDRO

---

26. *Id.*, 532 U.S. at 154–56, 121 S.Ct. 1322, citing, *Boggs*, 520 U.S. at 833, 117 S.Ct. 1754.

27. *See, Schmeusser v. Schmeusser*, Del.Supr., 559 A.2d 1294, 1298 (1989).

28. *See e.g., Id.* at 1298.

29. *Smith v. Mirman* 749 F.2d at 182, *citing*, H.R.Rep. No. 93–807, 93d Cong., 2d Sess. (1974).

from the Court because ERISA/REA does not confer beneficiary status on a non-participant spouse merely by reason of his or her former marital status.[30] The QDRO provisions of ERISA are mandatory, and in accord with these principles, Congress ensured that a state domestic relations order, as long as it meets certain statutory requirements, is not pre-empted by federal law. Because Wife failed to have an interim QDRO in place prior to Husband's death, and because, at Husband's death, the parties' children were designated as beneficiaries of Husband's 401(k) plan, pursuant to 29 *U.S.C.A.* § 1002(8)[31] the parties children will remain beneficiaries of said plan.

This rationale is consistent with the recent Supreme Court's decision in *Egelhoff*.[32] There, the Court held that Wife was entitled to the pension benefits, not because she was a former spouse, but because she was named as beneficiary according to the plan administration documents in place at her former husband's death.[33] The Supreme Court noted the importance of requiring the plan administrator to pay the benefits to the designated beneficiary.[34] Moreover, in enforcing the decedent's designation of the beneficiary, the Court emphasized the importance of establishing uniform administrative schemes, which provides a set standard for the disbursement of plan benefits.[35] Be-

cause Wife failed to file an interim QDRO in this case, 13 *Del. C.* § 1509 can not supersede the federal law.[36]

The Court notes that this is a unique case in that Husband died following the entry of the divorce decree yet before the property division hearing. Although the Administrator argues that the 401(k) should not be treated as a marital asset for property distribution purposes, the Court does not reward Husband for violating a state law, and, as a result, treats the 401(k) plan as part of the marital estate in the property distribution (See Exhibit A). Consistent with federal law, and because Wife failed to request at least an interim QDRO at the time of her divorce from Husband, the parties' children will remain the designated beneficiaries of Husband's 401(K) plan. At trial, Ms. Solomon indicated to the Court that awarding Husband's 401(K) plan to the children would cause the children to pay taxes within five years at their mother's tax rate. Based on the tax rates supplied by counsel with the assistance of Ross W. Burnam, C.P.A., P.A., the Court concludes that, based on Wife's estimated income ranging between $70,000–$100,000,[37] Wife's tax rates for federal and Delaware income taxes for 2001 though 2005 average approximately 34 percent. Therefore, for property distribution purposes, Husband's 401(k) account will be valued at $46,736 (See Exhibit A).[38]

**30.** *Boggs,* 520 U.S. at 845, 117 S.Ct. 1754.

**31.** 29 *U.S.C.A.* § 1002(8) provides that a "beneficiary" is a "person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."

**32.** 532 U.S. 141, 121 S.Ct. 1322, 149 L.Ed.2d 264.

**33.** *Egelhoff,* 532 U.S. at 150–52, 121 S.Ct. 1322.

**34.** *Id.*

**35.** *Id.*

**36.** *See e.g., Egelhoff,* 532 U.S. at 154–56, 121 S.Ct. 1322, *citing Boggs,* 520 U.S. at 833, 117 S.Ct. 1754(concluding that state-family law is pre-empted when it conflicts with ERISA).

**37.** This estimate of Wife's salary was received from Ms. Solomon.

**38.** 34 % of the value of Husband's 401(k) at separation is $24,075. $70,811 − $24,075 = $46,736.

IT IS SO ORDERED.

EXHIBIT A

| Assets | | Husband | Wife | Total |
|---|---|---|---|---|
| 1. | Marital Home [1] | | 119,000 | 119,000 |
| 2. | Acura | 3,825 | | 3,825 |
| 3. | Joint Dean Whitter | 19,150 | 18,352 | 37,502 |
| 4. | Dean Whitter (Wife) | | 8,854 | 8,854 |
| 5. | Checking/Savings account | | 5,279 | 5,279 |
| 6. | Firearms | 14,000 | | 14,000 |
| 7. | Tax Refund | | 7,374 | 7,374 |
| 8. | A/R | 35% | 65% | 100% |
| 9. | Business Account | 12,260 | | 12,260 |
| 10. | Case 1 | 35% | 65% | 100% |
| 11. | Case 2 | 35% | 65% | 100% |
| | TOTAL | 49,235 | 158,859 | 208,094 |

| Deferred Assets | | | | |
|---|---|---|---|---|
| 1. | 401(k) | 46,736 [2] | | 46,736 |
| 2. | Ralston Purina | | 23,000 | 23,000 |
| 3. | Melitta | | 16,000 | 16,000 |
| | TOTAL | 46,736 | 39,000 | 85,736 |
| | TOTAL | 95,971 | 197,859 | 293,830 |

| Debts | | | | |
|---|---|---|---|---|
| 1. | Wachovia Credit | | 6,784 | 6,784 |
| 2. | WTV (Visa) Credit | | 5,469 | 5,469 |
| 3. | First USA Credit | | 5,140 | 5,140 |
| 4. | WTC (M/C) Credit | | 1,458 | 1,458 |
| 5. | American Express | 1,184 | | 1,184 |
| 6. | School Tuition 1998–99 | | 8,915 | 8,915 |
| | TOTAL | 1,184 | 27,766 | 28,950 |
| | NET ESTATE | 94,787 | 170,093 | 264,880 |

| | | | |
|---|---|---|---|
| Total Assets | 264,880 | | |
| 35/65 Split | 92,708 | | 172,172 |
| Assets Retained | (95,971) | | (197,859) |
| Total Debts | 28,950 | | |
| 50/50 Split | (14,475) | | (14,475) |
| Debts retained | 1,184 | | 27,766 |
| | − 13,291 | | 13,291 |

H owes W $13,291 for debts

For Assets W owes H $6,870

Adjustments $13,291 − 6,870 = $6,421

**Estate to Pay Wife $6,421**

## EXHIBIT A

1.  The parties stipulated that the value of the marital home is $230,000. The existing mortgage/home equity debt totals $111,000.

2.  See footnote 38.